# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

Plaintiff,

vs. No. CV-95-846M

WILLLIAM McCALL, et al.,

Defendants.

## MEMORANDUM OPINION AND ORDER

This case came on for non-jury trial to determine whether the United States, specifically the agency within the United States Department of Agriculture known as Rural Economic and Community Development (formerly Farmers Home Administration or FmHA), is entitled to foreclose against property pledged to secure several notes on which defendants have defaulted. Because plaintiff delayed in taking action to collect on the notes, it is statutorily barred from a money judgment, but requests seizure and sale of real and personal property, costs and expenses of suit and foreclosure, interest on the outstanding debt and attorney's fees. In addition, plaintiff wants a ten percent surcharge, pursuant to Title 28 U.S.C. Section 3011, because it seeks to recover debt.

After hearing the evidence and examining the exhibits, I have decided that the United States is not entitled either to foreclose against defendants' property or to collect any statutory surcharge. Further, I find that in 1995, the plaintiff, more particularly, FmHA and its Farm Service Agency, wrongfully withdrew from a valid and enforceable settlement of all claims

against defendants and filed this case without regard for the parties agreement in compromise. FmHA's action is, therefore, without legal or otherwise justifiable grounds. Its initiation of litigation against defendants, after entering into a settlement agreement, warrants sanction in the form of payment to defendants for the costs of suit, expenses incurred by reason of the litigation and attorney's fees.

## JURISDICTION AND VENUE

The notes, mortgages and security agreements that constitute the basis of this action were executed and delivered in New Mexico to provide funds for defendants to conduct a business within the state. Defendants and the property at issue remain in New Mexico, and therefore, jurisdiction and venue are proper.

## SUMMARY OF THE CASE

It is undisputed that between 1977 and 1986, in order to obtain funds from FmHA, defendants executed nine notes, each on different terms and for varying amounts. One of the notes was a reamortization of another, but each provided defendants with significant amounts of cash for the pursuit of their enterprise, principally the breeding and sale of thoroughbred horses. Two mortgages and three security agreements, properly executed, filed and perfected, secure most of the indebtedness. It is also undisputed that defendants' business generally produced little income and defendants failed to repay their debt to the plaintff.

Defendants first default on the notes occurred in 1981. Apparently, FmHA did nothing until 1995, when it sought to collect against defendants. At that time, rather than convey their property to plaintiff, defendants entered into settlement negotiations with FmHA. Defendants contend that by a final agreement reached September 5 and 6, 1995, they were to pay FmHA

eighty-four thousand dollars in settlement of all amounts due. This amount was what FmHA's Farm Service Agency demanded to clear the outstanding indebtedness. However, when defendants accepted the offer of compromise and sought to pay the eighty-four thousand dollars, the Farm Service Agency revoked the offer and increased the amount required to settle.

Plaintiff does not dispute that defendants were ready and able to pay eighty-four thousand dollars within the allotted time. Plaintiff, specifically the Farm Service Agency, argues, instead, that it did not approve the eighty-four thousand dollar amount and any amount proffered in settlement and compromise was conditioned on a new appraisal of the property. At the same time, the Farm Service Agency offers no evidence that defendants knew the offer was subject to modification or revocation, depending on the outcome of an appraisal.

Thus, the essence of the dispute is reduced to basic contract law. Did the eighty-four thousand dollar amount represent *the agency's* offer of settlement? If so, did the agency retain a right to modify or revoke its offer after defendants' acceptance, depending on the outcome of an appraisal? And if the offer was not revocable, does defendants' acceptance stand as a complete defense to the present action by the doctrine of accord and satisfaction?

These questions are settled without doubt by the trial exhibits, all admitted by stipulation. Plaintiff's correspondence alone establishes that the prolonged negotiations which resulted in an agreement to compromise were initiated and controlled by the Farm Service Agency. Contrary to the characterization later put forward by the agency, that the settlement was unauthorized, plaintiff's exhibits clearly indicate that both the negotiations and the amount required to settle plaintiff's claims were directly dictated by the agency. The only puzzle, if

3

FmHA customarily requires an appraisal, is why the Farm Service Agency did not include the words "subject to a new appraisal" in a single reference to closing defendants' case by payment of a lump sum amount. Nevertheless, because FmHA or the Farm Service Agency failed to communicate the conditional terms of its offer to defendants, the offer was not subject to modification or revocation after acceptance. The agency was bound by the terms of its offer as the offer was articulated to defendants. This agreement in compromise of all plaintiff's claims stands as an accord and satisfaction that precludes plaintiff's right to bring the present action.

## FINDINGS OF FACT

Defendants stopped making payments on their indebtedness to plaintiff in 1981, but because plaintiff took no action until 1995, plaintiff was limited in 1995 to foreclosure. By letter dated March 17, 1995, then, from the United States Department of Agriculture to the United States Attorney in New Mexico, the latter was directed to initiate a civil action to enforce FmHA's security agreements and mortgages and take possession of defendants' real and personal property.

The March 17 letter, by an attachment entitled "Special Remarks," also noted that defendants' real property was encumbered by other liens and judgments and suggested a compromise of plaintiff's claims, short of litigation, if defendants paid $76,894.00. Signed by an Assistant Regional Attorney for the Department of Agriculture, neither the letter nor the attachment reference conditions or prerequisites to settlement. Neither is ambiguous or suggests, however indirectly, that the settlement figure might be conditional or subject to revocation. The attachment simply recites the dollar amount needed to close the case. Very

4

simply, it states: "The amount the agency will settle this account is $76,894.00."

Defendant William McCall was given this March 17 letter by an individual employed in the local office of the Farm Service Agency, and by it, McCall understood that FmHA was willing to settle and that it had set a specific settlement amount, without conditions or prerequisites. Either in the beginning of its negotiations with McCall or at some point early in the process, the Farm Service Agency knew that McCall had seen the March 17 letter and the settlement amount listed in its attachment.

By letter dated March 29, 1995, McCall was formally notified that plaintiff would pursue a foreclosure action. This letter also invited McCall to settle the claims against him prior to a court action. While the March 29 letter provided no amount or conditions under which the plaintiff would settle, it stated plaintiff's desire to dispose of the case without litigation. In response, both because he was aware of the March 17 letter and because he had few resources, McCall offered the Farm Service Agency fifty thousand to close the case.

By letter dated May 1, McCall was informed that the Farm Service Agency refused to accept fifty thousand dollars. Again, neither the Farm Service Agency nor the office of the United States Attorney made any reference to prerequisites to establishing a final settlement amount or conditions under which the agency would settle. This May letter indicates that "Farmers Home would like either the property or the total amount of value of the security currently held by Farmers Home. I have been informed by Farmers Home that the security has a value of approximately $84,100.00."

On May 11, McCall met with an Assistant United States Attorney, at which time, as documented by letter dated May 12, McCall proposed to pay the agency seventy thousand in

cash within ninety days, and within that same period to pay off six thousand in liens against the property. The May 11 letter, signed by the Assistant United States Attorney, states:

> I have delivered this offer to Farmers Home, but once again I must remind you that Farmers Home is the final authority on whether we can compromise the debt that you owe to them. I will let you know what their answer is as soon as I've received word from them. As we discussed, you have until August 15 to tender the $70,000 if Farmers Home accepts this counter-offer. I will continue to press my foreclosure action until such time as either (1) Farmers Home has accepted the offer and you have paid in full, or (2) Farmers Home rejects the offer in which case I will proceed to foreclose on the property. (Defendants' Exhibit E)

This letter, as those before it, is reasonably interpreted as an indication that FmHA would abate a foreclosure action and clear the debt, if an agreed dollar amount were paid within a reasonably immediate time. As previous letters, it conspicuously fails to reference any prerequisites or conditions to settlement. It says nothing about any FmHA practice or intention to leave open the amount to be paid, subject to a new appraisal of the property, even though at trial a witness representing the Farm Service Agency described the practice as "standard."

FmHA, through the Farm Service Agency, rejected McCall's offer to pay seventy thousand. A letter dated June 26, 1995, signed by an Assistant United States Attorney, stated:

> I have contacted the agency regarding your offer to settle this matter for $70,000; however, the Farmers Home Administration would like me to proceed with the foreclosure action unless you can pay to this office on or before July 15th $84,000. If that is not possible, I will file the foreclosure aciton on July 17th. (Defendants' Exhibit F)

6

Except for a final line in closing, this is the complete letter. Whether termed an offer or a counteroffer, the words stated clearly put forward an offer to compromise for a specific sum within a specific time, and thus establish the critical terms of an agreement to settle. Again, FmHA's communication sets no conditions or prerequisites which allow modification or revocation of a critical term after acceptance. The letter expressly fails to provide any right in FmHA to modify or revoke the settlement agreement, should a new appraisal provide an unexpected market value. All of these qualifications were added, *after* McCall accepted the offer at the stated amount.

The agency's offer to accept eighty-four thousand dollars remained pending for several weeks. When defendants were not able to accept the offer by the first deadline in July, it is undisputed that the time for acceptance was extended to September 6, and it is inconceivable, in view of the expanded time frame, that the Farm Service Agency was unaware of both the offer and the cutoff date. It is difficult to understand why the agency, during this time, neither undertook an appraisal nor communicated an appraisal requirement to defendants. Yet, it did not. An agreement was completed on September 6, and McCall reasonably expected his case had been resolved.

Without question, McCall's understanding of the June letter, that payment of eighty-four thousand dollars by a specific date meant FmHA would clear the indebtedness and abate foreclosure, was a reasonable interpretation. Any reasonable person would have understood the letter to mean exactly that. Most importantly, and directly opposing the Farm Service Agency's contention that it did not authorize a settlement amount of eighty-four thousand, the June 26 letter does more than articulate a firm offer, it states an offer in the name of the

7

agency and its terms expressly constitute *the agency's* offer to settle.

It appears FmHA or the Farm Service Agency may have intended to lock in an amount to be paid, acquire a new appraisal, and then enforce the amount agreed upon should the appraisal be lower than anticipated, and reject it should the appraisal be higher than anticipated. Hopefully, this is an erroneous perception and FmHA was not working, as it might appear, to take unfair advantage. But even if the agency intended to modify the payout amount to correspond to a current appraisal, regardless of which side received the benefit of the change, it cannot impose a condition on an offer or on an agreement to settle that has never been communicated.

By all of its communications and negotiations with defendants, then, the Farm Service Agency failed to reserve for itself a right to revoke or change its offer after acceptance. It was limited to the offer put on the table through the office of the United States Attorney, and whether privately it held reservations or did not, upon defendants' acceptance of the offer, the agency should have taken payment and closed the case. When McCall sent his delegate to accept the offer, however, the Farm Service Agency refused to take payment

Several months later, FmHA initiated this action to foreclose. In defending its position that it had a right to revoke the offer after acceptance, the Farm Service Agency makes no suggestion that defendant understood or anticipated what the agency describes as a customary practice of obtaining a new appraisal. The agency makes no claim it communicated to McCall or anyone else that it intended its offer to be provisional. The FmHA and the Farm Service Agency are thus bound by the deal as it was articulated it and should have known that to be the situation.

Had FmHA and the Farm Service Agency honored the agreement to settle as they should have, there would have been no reason to litigate. All costs and expenses incurred by either side, as a result of litigation, were incurred solely because FmHA failed to recognize and fulfill legal obligations which it itself created. Whether in 1999, plaintiff can collect the payment it refused in 1995, that is, whether defendants still have access to the funds, is a factual question not addressed at trial and remains a question outside the issues to be decided in this case. The fact that plaintiff at the moment is left without either defendants' money or defendants' property is a conundrum of its own making. The only issue to be decided here is whether plaintiff can foreclose against defendants' property, and I find that it cannot. The accord and satisfaction rendered in 1995 is a complete defense.

## CONCLUSIONS OF LAW

The statement of the March 17 letter that defendants' case could be closed for a specific dollar amount is not ambiguous. Statements in subsequent letters from the office of the United States Attorney to McCall, none of which made reference to any new or more current appraisal of the property or to FmHA practices which required a new appraisal, are also not ambiguous. These letters constituted negotiations between the parties. Corbin, Arthur Linton. 1 Corbin on Contracts, Rev. Ed. (Joseph M. Perillo, Ed.), 1993, Section 2.1.

"Preliminary actions and communications, even though not in themselves legally operative as offers of a bargain, may nevertheless be highly important in determining whether a contract has subsequently been consummated and what its terms are. . . .in any case, they form part of the background against which the final expressions of agreement must be

9

interpreted and understood. It is the meanings and intentions of the parties that justice require the court to determine and make effective." Id. at 104.

The correspondence from the office of the United States Attorney to McCall consists of the statements, offers and counteroffers of FmHA, through its Farm Service Agency, to McCall, and are not at any point the independent or unauthorized actions of an assistant United States attorney. In any event, after FmHA submitted its case against defendants to the office of the United States Attorney for collection, that office and its attorneys were the appropriate and legal conduit for negotiations and offers of settlement. Title 31 U.S. C. Sec. 3711(a)(2); 28 C.F.R. Sec. 0.160; 28 C.F.R. Pt.0, Subpt.Y, App. at Sec. 1. The office of the United States Attorney had authority to bind FmHA to the agreement of settlement and compromise accepted by defendants on September 5 and 6, 1995. Id.

All of the correspondence included in plaintiff's trial exhibits, as a whole, should be interpreted against FmHA, which is the "party in the superior position." Corbin, supra at Sec. 4.13, 637. The statement of the Department of Agriculture in its letter dated March 17, and the letters from the office of the United States Attorney to McCall led McCall reasonably to believe, and likely would have led any reasonable person to believe, that FmHA was interested in receiving a lump sum payment of seventy-five to eighty-four thousand dollars to close out defendants' indebtedness, without any other conditions or terms imposed. The June 26 letter constituted an explicit offer to compromise and settle all of plaintiff's claims for eighty-four thousand dollars. See: Id. at 30-31. The June 26 letter did not leave open any additional future terms which should have been apparent to its recipient. Nor did McCall have reason to

anticipate from the June 26 letter that additional terms would be forthcoming. Id., Sec. 2.1 at 30-31.

An expression "made in such a manner as justifies another person in thinking that it is directed to him or her for acceptance" or an act "that leads the offeree reasonably to believe that a power to create a contract is conferred," constitutes an offer. Id. at 30. And FmHA's final offer to accept eighty-four thousand dollars to settle plaintiff's claims against defendants was without condition or right of revocation. Therefore, because FmHA failed to communicate to defendants any right of revocation, its final offer was *not* subject to modification or revocation after defendants' acceptance. Id. at 222-223.

> An offeror has full power over the terms of the offer. The offeror can create in the offeree a power of acceptance that is as limited, or as difficult to exercise, as the offeror pleases and can reserve a power of revocation to be exercised in any way. In order to do this, all that is necessary is that the offeree shall be informed of the limitation, or of the reservation, at any time before the offer is accepted. If the offer is in writing, the limitation, or the reservation should be expressed in the writing itself, so that knowledge of the whole comes to the offeree at the same time. Id. at 221.

The eighty-four thousand dollars to be paid by McCall constituted new consideration. Western Bank of Santa Fe v. Biava, 109 N.M. 550, 787 P.2d 830 (1990). Putting together offer, acceptance and consideration, then, the parties created an enforceable, bilateral contract. Id.; Corbin, supra at Sec. 2.19 and Sec. 3.8. A "meeting of the minds" is no longer required. It is not an "unvarying prerequisite of an enforceable contract." Id. at Sec. 4.13, 636. "It is clear today that the consummation of a contract does not require two actually consenting minds at one moment of time. It is equally unnecessary that there should be

11

simultaneous expression of consent." Id., sec. 2.1 at 225. Thus, once McCall accepted FmHA'a offer to settle for payment of eighty-four thousand dollars, FmHA could not revoke or repudiate the agreement. Id.

McCall accepted FmHA's offer to settle for eighty-four thousand dollars when he arranged for a loan in that amount and his willingness to pay the amount demanded was communicated to the Farm Service Agency on September 5. See: Id. at Sec. 3.8. Notice of acceptance and a readiness to procure the money are sufficient to create an enforceable contract without actual payment. Id. at 348.

Therefore, the agreement completed September 6, 1995, (by defendants' acceptance of FmHA's offer of compromise and defendants' immediate readiness to pay plaintiff eighty-four thousand dollars) discharged defendants' original indebtedness, and by an accord and satisfaction, substituted defendants' promise to pay eighty-four thousand dollars. United States v. Sackett, 114 F.3d 1050, 1052 (10th Cir.1997). This agreement in accord and satisfaction is supported by consideration and is otherwise enforceable, and in 1995, plaintiff could not, and cannot now, rescind it, reinstate the original indebtedness and take action on the mortgage. Id.; Corbin, supra at Vol. 6, Sec. 1276, 115.

"Discharge by accord and satisfaction means a discharge by the rendering of some performance different from that which was claimed as due and the acceptance of such substituted performance by the claimant as full satisfaction of his claim." Id. The term thus denotes an age-old method for "discharging and terminating an existing right and constituting a perfect defense in an action for enforcement of a previous claim." Id.; United States v. J.F. White Engineering Corporation, 311 F.2d 410, 412 (10th Cir. 1962).

While some legal digests and other sources may treat "compromise and settlement" and "accord and satisfaction" under separate headings, they are not separate and independent methods of settling claims. Id. at Sec. 1278, 124. "As the term is actually defined and applied in cases and treatises, an accord is an agreement for the settlement of some previously existing claim by a substituted performance. It will be found that this definition of accord also includes all compromises; they are agreements for the settlement of a previously existing claim by a substituted performance." Id.

What FmHA offered, therefore, through the office of the United States Attorney, is an accord, and Defendant McCall by his acceptance of the offer, completed an accord and satisfaction that ended the dispute and all claims between the parties. It makes no difference that FmHA or the Farm Service Agency did not know that the statements in the June letter constituted an offer, and when accepted, an accord. The fact that a creditor's misunderstanding makes no difference to a discharge of his claims "is supported by fundamental legal doctrine." Id. at Sec. 1279, 131. "The acceptance of an offer makes a contract even though the parties do not know the law or the legal consequences of their agreement. It is the prevailing rule that ignorance of legal consequences does not prevent one's voluntary acts from having such consequences." Id.

## REIMBURSEMENT DUE DEFENDANTS

In the circumstances of this case, of course, plaintiff had available legal counsel not only in the office of the United States Attorney, but also in the Department of Agriculture. Rather than utilize counsel or consider its circumstances in light of clear and long-standing legal principles, however, FmHA and the Farm Service Agency repudiated its own demand,

13

refused the payment solicited, and then initiated an action to foreclose. At no time, apparently, did FmHA consider its legal position or limitations on its right to revoke an unconditional offer after acceptance. As a result, it initiated the filing of a frivolous and groundless foreclosure action which has wasted the resources of the court and imposed great hardship and expense upon the defendants.

If it is accurate that FmHA customarily requires an appraisal, then FmHA should have secured one before it set its settlement figure. At a minimun, it should have expressed with exceptional clarity both the requirement of an appraisal prior to any final agreement and the right of the agency to revoke or modify its offer depending on the appraisal result. What appears in the record, however, goes only the opposite direction and makes the agency appear neither fair nor forthright. On the one hand, the agency states: "The amount the agency will settle this account is $76,894.00." On the other, a mere five months later and several thousand dollars more than its initial figure, FmHA refuses defendant, money in hand.

FmHA and the Farm Service Agency had no basis in fact or in law for its abrupt change of position which revoked the essential term of settlement it had itself unilaterally established. Then going well beyond refusal to accept the amount in compromise, FmHA followed one unjustifiable action by another. It caused to be filed the present civil action without factual or legal premise, in an attempt to enforce original obligations as if no settlement agreement had been reached. The agency's actions depart so far from reasonableness as to warrant the imposition of sanctions. See: United States v. Christensen, 961 F.2d 221 (10th Cir. 1992).

In the interests of judicial efficiency, therefore, and to deter frivolous and groundless

filings in the future, as well as to compensate defendants for the economic harm incurred by plaintiff's unreasonable conduct, plaintiff, more specifically the Farm Service Agency and Rural Economic and Community Development, is to reimburse defendants' costs in this lawsuit and any directly related expenses, such as travel for trial, and defendants' attorney's fees.

Within thirty days, defendants are to present plaintiff their itemization of charges incurred by reason of plaintiff's filing this action, and if plaintiff and defendants cannot agree on the amount owed defendants, the parties are to request a hearing.

NOW, THEREFORE, IT IS ORDERED that judgment enter in favor of defendants.

IT IS FURTHER ORDERED that plaintiff be assessed the costs of suit, defendants' attorney's fees and other expenses incurred as a direct result of plaintiff's filing.

_____
SENIOR UNITED STATES JUDGE